# IN THE UNITED STATES DISTRICT COURT

## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| PATRICIA ZUBACK, | CASE NO. 4:14-cv-00602-GBC |
| Plaintiff, | |
| | (MAGISTRATE JUDGE COHN) |
| v. | |
| | MEMORANDUM |
| CAROLYN W. COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY, | |
| | Docs. 1, 5, 6, 7, 9, 11, 12, 13, 14 |
| Defendant. | |

## MEMORANDUM

### I.     Procedural Background

On April 11, 2011, and April 21, 2011, Patricia Zuback ("Plaintiff")
respectively filed as a claimant for disability insurance benefits under Title II and
XVI of the Social Security Act, 42 U.S.C. §§ 401-34, 1181-1183f, with a date last
insured of September 30, 2010,[1] and claimed a disability onset date of May 31,
2009.  (Administrative Transcript (hereinafter, "Tr."), 13).

After the claim was denied at the initial level of administrative review, the
Administrative Law Judge (ALJ) held a hearing on July 19, 2012.  (Tr. 27-51).  On

---

[1] Disability insurance benefits are paid to an individual if that individual is disabled and
"insured," that is, the individual has worked long enough and paid social security taxes. 42
U.S.C. §§ 415(a) and 416(i)(1). The last date that a claimant meets the requirements of being
insured is commonly referred to as the "date last insured." *See* 42 U.S.C. § 416(i)(2); *accord*
*Renfer v. Colvin*, No. 3:14CV611, 2015 WL 2344959, at *1 (M.D. Pa. May 14, 2015).

August 29, 2012, the ALJ found that Plaintiff was not disabled within the meaning of the Act. (Tr. 10-26). On October 22, 2012, Plaintiff sought review of the unfavorable decision, which the Appeals Council denied on January 27, 2014, thereby affirming the decision of the ALJ as the "final decision" of the Commissioner. (Tr. 1-9).

On March 31, 2014, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. § 405(g) and pursuant to 42 U.S.C. § 1383(c)(3), to appeal a decision of the Commissioner of the Social Security Administration denying social security benefits. (Doc. 1). On May 30, 2014, the Commissioner ("Defendant") filed an answer and an administrative transcript of proceedings. (Doc. 5, 6). July 9, 2014, Plaintiff filed a brief in support of the appeal. (Doc. 7 ("Pl. Brief")). On August 5, 2014, Defendant filed a brief in response. (Doc. 9 ("Def. Brief")). On November 5, 2014, the Court referred this case to the undersigned Magistrate Judge. Both parties consented to the referral of this case to the undersigned Magistrate Judge, and an order referring the case to the undersigned Magistrate Judge was entered on March 30, 2015. Doc. 11, 12, 13, 14.

## II.    Relevant Facts in the Record

Plaintiff was born on November 27, 1976, and thus was classified by the regulations as a younger person through the date of the ALJ decision rendered on

August 29, 2012.  20 C.F.R. § 404.1563 (c); (Tr. 32).  Plaintiff graduated high school in 1995 and did not receive any additional training.  (Tr. 131).

Earnings reports demonstrate that since high school, Plaintiff has worked with several different employers as follows: 1) 1995: met earning threshold for one quarters of coverage[2], totaling $813.38; 2) 1996: no earnings; 3) 1997: no earnings; 4) 1998: met earning threshold for four quarters of coverage with three employers, totaling 8008.92; 5) 1999: met earning threshold for four quarters of coverage with three employers, totaling $5372.84; 6) 2000: met earning threshold for four quarters of coverage with two employers, totaling $3447.87; 7) 2001: met earning threshold for four quarters of coverage with three employers, totaling $11285.50; 9) 2002 met earning threshold for four quarters of coverage with one employer,

---

[2] After 1977, the Commissioner of the Social Security Administration determines the amount of taxable earnings that will equal a credit for each year which is determined by using a formula in the Social Security Act that reflects a national percentage increase in average wages.  42 U.S.C.A. § 413; 20 C.F.R. § 404.140; 20 C.F.R. § Pt. 404, Subpt. B, App.; "Quarters of coverage," 1 Soc. Sec. Disab. Claims Prac. & Proc. § 8:10 (2nd ed.) (list of earnings needed to earn one quarter of coverage for years from 1975 to 2012); *see also* "Amount of earnings needed to earn one quarter of coverage" https://www.socialsecurity.gov/oact/cola/QC.html#qcseries (last accessed September 14, 2015) (list of required earnings through 2015) (list of required earnings through 2015).

In a claimant's earnings record, a "c" indicates that a claimant has earned enough to qualify for a quarter of coverage and a "n" indicates that the threshold amount was not earned in a given year. *See* "Understanding an earnings record," 1 Soc. Sec. Disab. Claims Prac. & Proc. § 5:21 (2nd ed.).  For example, in 2000, "cccc" would indicate that a claimant has earned at least $780 each quarter of 2000 and "cccn" would indicate that a claimant earned at least $780 for the first three quarters of 2000.  *See* "Understanding an earnings record," 1 Soc. Sec. Disab. Claims Prac. & Proc. § 5:21 (2nd ed.); "Amount of earnings needed to earn one quarter of coverage" https://www.socialsecurity.gov/oact/cola/QC.html#qcseries (last accessed September 14, 2015) (list of required earnings through 2015).

totaling $4411.27; 10) 2003: met earning threshold for one quarter of coverage with one employer, totaling $1762.34; 11) 2004: met earning threshold for four quarters of coverage with two employers, totaling $3817.32; 12) 2005: did not meet earning threshold for any quarter of coverage with one employer, totaling $62.00; 13) 2006: met earning threshold for two quarters of coverage, with one employer, totaling 2778.79; 14) 2007: met earning threshold for four quarters of coverage with three employers, totaling $12265.01; 15) 2008: did not meet earning threshold for any quarter of coverage with two employers, totaling $671.51; 16) from 2009 to 2012: did not earn any income. (Tr. 116, 121-24).

## A. Plaintiff's Testimony

Plaintiff testified that she has felt the need to seek psychiatric hospitalization, however, she was too afraid of what would happen to her children if she sought the treatment, adding "[i]t scares me more than anything." (Tr. 36). Plaintiff testified that her eldest does "mostly all of the cooking," bathes and feeds the youngest child, does the laundry, and cleans the house. (Tr. 37, 39). Plaintiff testified that she will make ramen noodles or pizza while her eldest child "does a lot more, like hamburgers or she bakes, she cooks." (Tr. 39). Plaintiff testified that her ex-husband takes her eldest child to the Laundromat her eldest child washes the clothes, brings them and hangs them up. (Tr. 39). When questioned more about who does the cleaning in her house, Plaintiff testified that her eldest

did a lot of the picking up and the dishes, and her middle child vacuumed.  (Tr. 39).

## B.  Relevant Treatment History and Medical Opinions

### 1.  Meadows Psychiatric Center: Rashid S. Chaudhry, M.D.; Sarah E. Boone

A discharge summary dated April 10, 2008, noted that Plaintiff was admitted on March 28, 2008, and discharged April 10, 2008.  (Tr. 190).  Plaintiff voluntarily admitted herself for inpatient treatment, stating that her chief complaint was her "problem with drinking."  (Tr. 190).  Plaintiff reported that she had been depressed, shaking a lot, and could not stop crying.  (Tr. 190).  Plaintiff reported she thought about hurting herself, wanted to kill herself, and she tried to kill herself recently by overdosing on blood pressure medication.  (Tr. 190).  Plaintiff reported feeling hopeless and helpless, with low concentration and inability to pay attention.  (Tr. 190).  Plaintiff reported that her energy level was poor; she was tired all the time, and experienced difficulty sleeping.  (Tr. 190).  Plaintiff reported experiencing low self-esteem and lacking interest in daily activities.  (Tr. 190).  Plaintiff reported no auditory or visual hallucinations, and no paranoia.  (Tr. 190).

Plaintiff reported being sexually and physically abused from eight years old until her teens.  (Tr. 190).  Plaintiff reported that her ex-husband also sexually and physically abused her and she currently has a protective order against her ex-

husband. (Tr. 190). Plaintiff reported experiencing nightmares, flashbacks, and intrusive thoughts about the past. (Tr. 190).

The discharge report noted that Plaintiff had self-injurious behavior, had been cutting herself and she was found to be with a razor. (Tr. 190). Plaintiff reported that she felt overwhelmed, was not able to keep herself safe, and that was why she came to the hospital. (Tr. 190). The discharge report noted that Plaintiff did not have any psychiatric provider and that she currently attended Crossroads Drug and Alcohol Program. (Tr. 190). Plaintiff was currently on several medications including Effexor XR and Ativan. (Tr. 191). Plaintiff reported having previous prescriptions for other antidepressant medications but could not recall the names of the medications. (Tr. 191). Plaintiff reported previous work as a CNA and laborer. (Tr. 191). Plaintiff reported a recent history of drinking alcohol and smoking marijuana, and having tried cocaine once. (Tr. 191). Plaintiff reported that she had some DUI-related fines to pay. (Tr. 191). It was also noted that Plaintiff had two children who lived with their father. (Tr. 190).

Upon examination Dr. Chaudhry observed that Plaintiff exhibited a labile affect, sadness, and was positive for suicidal ideation and self-harm. (Tr. 191). Dr. Chaudhry opined that Plaintiff's insight was "fair" and capacity for activities of daily living was "limited." (Tr. 191-92). Dr. Chaudhry observed that Plaintiff's long term memory was intact and her short term memory was "poor" as she was

unable to recall three out of three objects after five minutes. (Tr. 192). Dr. Chaudhry also observed that Plaintiff's concentration was "poor" given that she was able to spell "World" forward, but not backward. (Tr. 192). Dr. Chaudhry noted that Plaintiff was alert and oriented times three, cooperative and easy to get along with. (Tr. 192).

During her inpatient psychiatric hospitalization, Plaintiff repeatedly struggled with suicidal ideation, and clothing that she could hang herself with was found with her. (Tr. 192-93). Plaintiff reported that she "a lot of nursing staff . . . [were] against her and they [were] not dealing appropriately." (Tr. 193). For admission diagnoses, Dr. Chaudhry listed: major depression, recurrent; post-traumatic stress disorder; and, alcohol abuse. (Tr. 193-94). Upon admission, Dr. Chaudhry assessed Plaintiff with a GAF score of 10 and at discharged a GAF score of 55. (Tr. 193).

In a discharge report dated June 23, 2008, Plaintiff was involuntarily admitted from Lock Haven Hospital on June 7, 2008, and was discharged on June 23, 2008. (Tr. 197). The report indicated that Plaintiff's chief complaint was that she was "having a bad day." (Tr. 197). It was noted that Plaintiff's two children live with their father. (Tr. 197). Plaintiff reported that she told her friend that she wanted to "end it all," the friend reported it to police who found Plaintiff unresponsive next to an empty medication bottle, with a blood alcohol level of

0.07, and a laceration of wrist. (Tr. 197). Although Patient reported that it was accidental, she almost killed herself, wrote will, and detailed how she wished to be disposed of and a goodbye note to her family. (Tr. 197, 200). Plaintiff reported feeling tired all of the time. (Tr. 197). The discharge report noted that Plaintiff saw Dr. Nicotera at Universal Community Behavioral Health ("UCBH") and also goes to Crossroads for drug and alcohol treatment. (Tr. 198). For treatment history, it is noted that Plaintiff has had "multiple admissions in the past" and has been at Geisinger Medical Center as well as Meadows Outpatient and Inpatient treatment, noting that she was at Meadows earlier that year. (Tr. 198). Plaintiff reported a history of and current alcohol use. (Tr. 198).

Upon examination, Dr. Chaudhry noted that Plaintiff was "extremely disheveled and had poor cognitive process, She looked extremely depressed and hard a hard time staying awake." (Tr. 198). Dr. Chaudhry further noted that Plaintiff had "poor cognitive process," "psychomotor slowness," "soft and slow" speech, and labile affect. (Tr. 198). Plaintiff reported suicidal and homicidal ideation, and continued to have flashbacks and nightmares. (Tr. 199). Dr. Chaudhry opined that Plaintiff had the capacity to harm self and others, possessed limited judgement and insight, and had an inadequate capacity for activities of daily living. (Tr. 199). Dr. Chaudhry noted that Plaintiff was oriented to time, place, and person; long term memory was partly intact and her short term memory

was "poor" as she was unable to recall three out of three objects after five minutes; and, her concentration was poor given her inability to spell "WORLD" backwards. (Tr. 199). Dr. Chaudhry noted that Plaintiff's urine drug screen showed nothing detected. (Tr. 200).

Dr. Chaudhry noted that Plaintiff "tried to minimize everything" and Plaintiff was told that she was minimizing the situation and that husband also had problems [with drinking alcohol] and that was not helping. (Tr. 200-01). Dr. Chaudhry opined that Plaintiff had "problems with drinking because of depression and other psychiatric symptomatology" and "tends to overdose on medication because she becomes disinhibited." (Tr. 200). Plaintiff "was not able to understand that it was hard for her grasp that idea." (Tr. 200). Plaintiff's diagnoses remained the same with the addition of bipolar disorder, depressed episode. (Tr. 201-02). Plaintiff's admission GAF score was 10 and her discharge GAF score was 50. (Tr. 202).

### 2. Lock Haven Hospital: Dr. Bharat Adroja, M.D.; David Gingrinch, M.D.; Carmen Ferrigno, M.D.; Tammy Mackey, R.N.

On January 27, 2011, Plaintiff presented to the emergency department with complaints of sharp chest pain of nine out of ten (with ten indicating the greatest severity) radiating into the left arm. (Tr. 207, 211). Plaintiff was able to ambulate independently and could perform all activities of daily living without assistance.

(Tr. 211). Upon examination, Plaintiff was in mild distress and was mildly anxious. (Tr. 207). Plaintiff had an unremarkable EKG, chest X-ray revealed no acute disease, and all the laboratory work did not reveal any significant abnormalities. (Tr. 207). Clinical impression was "chest wall pain." (Tr. 207).

On June 19, 2012, Plaintiff reported generalized weakness, fatigue, and trouble at times with balance. (Tr. 320). On June 28, 2012, Plaintiff sought treatment following a motor vehicle accident and complained of anxiety and related injuries. (Tr. 323-26). Clinical impression was contusion, ligamentous strain, acute cervical strain, and acute lumbar strain. (Tr. 323, 326). On June 28, 2012, A CT of Plaintiff's lumbar spine revealed normal alignment of the lumbar spine without a fracture deformity and "status-post posterior spinal fusion of L5-S1. The hardware appears in good position with no evidence of migration or breakage of the hardware." (Tr. 317). On July 10, 2012, Plaintiff sought treatment for frequent headache and right shoulder blade pain after a recent motor vehicle accident, rating her pain as ten out of ten. (Tr. 318). Upon examination, Plaintiff had spams of the paraspinal muscles of the neck on the left occipital area and right trapezius. (Tr. 319). Clinical impression was cervical strain. (Tr. 319).

### 3. SHMG/Lock Haven Family Practice: Thane N. Turner, M.D.

From May 15, 2009, to March 7, 2011, Plaintiff followed-up on a monthly basis with her primary care physician Dr. Turner. (Tr. 224-43). On May 15, 2009,

Plaintiff sought to reestablish care with Dr. Turner after not seeing her since the prior summer. (Tr. 243). After she last saw Dr. Turner the previous summer Plaintiff "had a period of hospitalization for psychiatric issues" and "[f]ollowing all of that, she actually got pregnant." (Tr. 243). Dr. Turner noted that as a result of the pregnancy, Plaintiff no longer used any substances, alcohol, or illegal drugs. (Tr. 243). Plaintiff denied being suicidal or homicidal. (Tr. 243). Dr. Turner observed that Plaintiff was tearful at times. Plaintiff stated that she would like to try to avoid medicines currently especially since she was breastfeeding. (Tr. 243).

In a treatment record dated June 9, 2009, Plaintiff reported that after one of her recent counseling sessions, she just became more easily upset, more anxious, panicky, and ended up in the emergency room. (Tr. 242). Plaintiff was given Ativan and although initially hesitant to consider medications, due to the fact that counseling was bringing up a lot of difficult issues, Plaintiff reported that she would consider more pharmaceutical treatment. (Tr. 242). Plaintiff denied any suicidal or homicidal ideation. (Tr. 242).

On July 10, 2009, Plaintiff followed-up for emotional issues, borderline personality disorder, anxiety, and depression. (Tr. 241). Plaintiff reported seeking treatment with Dr. Roy MHMR and continuing Paxil. (Tr. 241). Plaintiff reported that she tried Geodon, but could not tolerate the sedative side-effects and her providers recommended that she start lithium. (Tr. 241). Plaintiff denied any

suicidal or homicidal ideation and reported feeling less panicky while on Paxil. (Tr. 241).

On August 5, 2009, Plaintiff followed-up from an ER visit stemming from an altercation with her boyfriend. (Tr. 240). Plaintiff reported that her boyfriend hit her, she then grabbed a knife, and her children called 9-1-1. (Tr. 240). When the police arrived, the boyfriend stated that Plaintiff was threatening to kill herself, while Plaintiff reported that such was not the case, rather she was just protecting herself from the boyfriend. (Tr. 240). Plaintiff reported that she had been out drinking that evening and there was evidence of alcohol consumption when she arrived to the ER. (Tr. 240).

In a treatment record dated August 28, 2009, Plaintiff was following up regarding an "episode of abuse," and also a history of personality disorder, anxiety, depression, history of asthma, remote history of hypertension and Grave's disease. (Tr. 239). Plaintiff reported that she was doing a little better and in a little safer situation. (Tr. 239). Plaintiff reported that her previous boyfriend had not been around and that there were no further altercations. (Tr. 239). Plaintiff reported taking Paxil and had weaned off the Lithium because of its side-effects. (Tr. 239).

In a treatment record dated October 13, 2009, Plaintiff reported that with regards to the borderline personality disorder, she continued to follow-up with her psychiatrist. (Tr. 238). Plaintiff reported that she was currently on just Paxil, did

not lithium and she uses clonazepam as needed.  (Tr. 238).  Plaintiff was scheduled to see her psychiatrist later in the month.  (Tr. 238).  In a treatment record dated December 14, 2009, Plaintiff reported much less anxiety following the recent surgical removal of her thyroid.  (Tr. 237).

In a treatment record dated July 26, 2010, Plaintiff followed-up for hypertension, hypothyroidism, and anxiety disorder.  (Tr. 234).  Plaintiff stated that she was struggling a little bit the last couple of days and had been through some stressful situations followed by experiencing some chest pain, back pain, and some shortness of breath.  (Tr. 234).  Dr. Turner noted that the chest pain may be due to many factors including stress and anxiety attacks.  (Tr. 234).

In a treatment record dated August 23, 2010, Plaintiff presented for a sexual abuse examination, reporting that on August 6, 2010, she was raped by three unknown men.  (Tr. 233).  Plaintiff initially did not seek any medical attention, and later went to the ER about five days later where they did gave her antibiotics but did not do an internal exam.  (Tr. 233).   Plaintiff reported of some injury to left hand, and that her fourth and fifth fingers were also numb. Dr. Turner noted that they extensively discussed her emotional issues and that Plaintiff was still following through with treatment at Universal Community Behavioral Health.  (Tr. 233).

In a treatment record dated September 16, 2010, Plaintiff followed-up with regards to the recent rape and stated that she discontinued perusing legal recourse since doing so caused too much distress and anxiety, and she wanted to move on. (Tr. 232). In a treatment record dated October 29, 2010, Plaintiff reported that she is adjusting to her psychiatry medication and was currently on Paxil, Risperdal, Prazosin, and Ativan. (Tr. 230).

In a treatment record dated November 29, 2010, Plaintiff reported that she still experiences headaches on and off for years of her headaches, however now, she is not sure whether it was allergy or sinus related. (Tr. 229). Plaintiff was trying not to take over-the-counter medicine, but was struggling with the headaches. (Tr. 229). In a treatment record dated December 22, 2010, Dr. Turner noted that he started Plaintiff on verapamil the last visit to address the headaches but she was still experiencing the headaches, though not as much as previously. (Tr. 228). Plaintiff reported stopping Risperdal due concern regarding the side-effects. (Tr. 228).

In a treatment record dated February 2, 2011, Plaintiff followed up from an ER visit for severe chest pain. (Tr. 227). Plaintiff reported continuously experiencing back pains, a history of lumbar disc disease, and a laminectomy in the past. (Tr. 227). During the ER visit, it was noted that her X-ray revealed evidence

of scoliosis, and the Vicodin administered in the ER helped somewhat with the pain.  (Tr. 227).

Upon evaluation, Dr. Turner observed regular rhythm and rate of the heart beat and "[p]alpation of the left lateral chest wall [revealed] reproducible pain along the ribcage" and examination of the thoracic spine revealed tenderness along the thoracic spine, especially in between the scapulae.  (Tr. 227).

In a treatment record dated March 2, 2011, Plaintiff sought follow-up treatment for back pain.  (Tr. 226).  Plaintiff reported that she was doing physical therapy, and experiencing a little more of a problem in the lower lumbar region even she shifts positions.  (Tr. 226).  Plaintiff reported hearing a pretty loud pop or crack in the low back.  (Tr. 226).  Plaintiff reported undergoing a previous lumbar disc surgery at the Orthopedic Institute of Pennsylvania in Camp Hill, PA.  (Tr. 226).  Plaintiff reported that she was fairly stable emotionally.  (Tr. 226).

Upon examination, Dr. Turner observed that it was "easy to hear the crepitus that occurred when she shifted her lower back."  (Tr. 226).  Dr. Turner noted that Plaintiff had a known history of lumbar disc disease; also scoliosis noted on x-rays, Plaintiff experienced chronic headaches, and borderline personality disorder.  (Tr. 226).

///

///

### 4. Universal Community Behavioral Health (UCBH): Punyabrata Roy, M.D.

A treatment record dated July 1, 2009, noted that Plaintiff lived with her children, was unemployed and supported by welfare. (Tr. 245). At the time of the visit Plaintiff had two-month-old baby from a C-section. (Tr. 245). Plaintiff reported that she had a history of mood swings, sometimes she felt depressed, hopeless, helpless, lonely, and cries. (Tr. 245). While at other times, Plaintiff felt she was on top of everything. (Tr. 245). Plaintiff reported that sometimes she felt it was difficult for her to slow herself down. (Tr. 245).

Plaintiff reported that she was abused physically by her first boyfriend and by the ex-husband. (Tr. 245). Plaintiff reported that as a result of the abuse sometimes she feels numb and shaky when she remembers those things. (Tr. 245). Plaintiff reported that she was raped at the age of 17 and did not know who raped her. (Tr. 245). Plaintiff stated that she did not want to remember past trauma because trying to recall it causes her shakiness and nervousness and sometimes she gets flashback of the trauma. (Tr. 245).

For psychiatric history Plaintiff has had "multiple psychiatric admissions." (Tr. 245). Plaintiff was admitted twice to The Meadows in 2008 and was admitted in Geisinger in February 2008. Plaintiff reported that she would cut herself to take the pain away when she was abused by her boyfriend. (Tr. 245). Plaintiff reported

that she overdosed on Ativan in May 2008 when she was admitted in The Meadows.  (Tr. 245).  Plaintiff had started therapy with Lisa at UCBH.  (Tr. 245).

Plaintiff reported that she started drinking alcohol since the age of thirteen, that she used to drink alcohol during the weekend and currently does not drink alcohol. (Tr. 246).  The last time she drank alcohol was September 2008.  (Tr. 246).  Plaintiff reported a history of one DUI in 2006.  (Tr. 246).  Plaintiff reported smoking marijuana since the age of 17, but she smokes marijuana very occasionally and the last time she smoked marijuana was two years ago.  (Tr. 246).  Plaintiff reported that she completed twelfth grade, worked in different places, worked as certified nursing assistant (CNA) on and off, worked as a housekeeper, bartender, and also she worked in a window factory.  (Tr. 246).

Upon examination Dr. Roy opined that Plaintiff's judgment and insight were limited, her impulse control was adequate, and thought process was within normal limits. (Tr. 246).  Plaintiff reported that she had no major physical problem.  (Tr. 246).   Dr. Roy diagnosed Plaintiff with posttraumatic stress disorder; bipolar disorder, not otherwise specified (NOS); and, borderline personality disorder.  (Tr. 247).  Dr. Roy assessed Plaintiff with a GAF score of 55.  Plaintiff reported that she was prescribed Klonopin for anxiety and Paxil by her primary care physician and that the medication was helping her.  (Tr. 247).  Plaintiff was also given

Geodon for her mood swings and after being informed of the potential side-effects, Plaintiff wished to continue the prescribed medications.  (Tr. 247).

In a treatment record dated April 6, 2011, Plaintiff brought her youngest daughter with her for the visit and reported that she occasionally felt anxious especially in social situations or any situation where there is crowd or a lot of people she feels really embarrassed and anxious.  (Tr. 249).  Plaintiff reported that he mood was not great.  (Tr. 249).  Dr. Roy observed that Plaintiff looked anxious.  (Tr. 249).  Dr. Roy continued the same diagnoses, noted that she had a history of alcohol abuse until Plaintiff became pregnant, that she lived alone with her three children, and was recently raped.  (Tr. 249).  Dr. Roy assessed Plaintiff with a GAF score of 58 and increased her dosage of Paxil to address her anxiety.  (Tr. 249).

### 5.  Tiadaghton Health Services; Elaine Dorney, P.T.; Susan Smith, P.T.

In an intake record dated February 17, 2011, noted that Plaintiff's posture and alignment were generally normal with a more prominent left waist crease and depression of the right inferior and medial scapular angles as well as the right shoulder with respect to the left.  (Tr. 261).  Trunk extension was up to twenty degrees with pain in lumbar spine, range of motion for bilateral side bending and rotation was within normal limits.  (Tr. 261).  Plaintiff's bilateral hip flexion, knee

flexion and extension, dorsiflexion, plantar flexion and great toe extension were five out of five and abdominal strength was three out of five. (Tr. 261).

On March 21, 2011, Plaintiff reported improvement in her ability to stand long enough to wash dishes without increasing back discomfort and has not yet attempted to walk to pick up her child in school. (Tr. 253). Ms. Dorney noted that Plaintiff had made some progress in performing functional activities and the goal to decease pain to five out of ten had not been met. (Tr. 253). On March 28, 2011, Plaintiff reported that once she stopped sleeping on an air mattress and slept on a firm normal mattress, she was able to sleep well. (Tr. 252). Ms. Dorney noted that Plaintiff was able to go through all of the exercises without significant difficulty or problems. (Tr. 252). On March 30, 2011, Plaintiff reported that she almost fell off a step stool and down a flight of stairs and was helped by her son. (Tr. 251).

In a discharge report dated April 28, 2011, Ms. Dorney noted that Plaintiff was last seen on March 30, 2011, but failed to attend her next scheduled appointment on April 5, 2011, and had not called to schedule further appointments. (Tr. 250). "When she was last seen she was performing a comprehensive exercise program for core stabilization and back strengthening, and was able to do all of the exercises without significant problems. (Tr. 250).

///

**6. Orthopedic Institute of Pennsylvania: Raymond E. Dahl, D.O.**

In a treatment record dated April 26, 2011, Plaintiff reported having undergone posterior spinal fusion at L5-S1 for grade1 spondylolisthesis at L5-S1. (Tr. 265). Plaintiff reported that she had been experiencing a lot of pain involving her low back and had been managing her pain with Vicodin. (Tr. 265). Plaintiff reported experiencing numbness and tingling radiating down both legs and that her left leg was much worse than the right. (Tr. 265). Dr. Dahl diagnosed Plaintiff with "[l]ow back pain status post posterior spinal fusion L5-S1." (Tr. 265).

**7. Jersey Shore Hospital Department of Radiology: Nicholas Fasano, M.D.; Lisa K. Strawser, D.O**.

In a record dated February 2, 2011, Dr. Strawser interpreted X-rays of Plaintiff's spine and her impressions were scoliotic curvature of the spine and surgical hardware in place at the lumbosacral junction. (Tr. 273). In a record dated March 2, 2011, Dr. Strawser interpreted subsequent X-rays with the following impressions: 1) Grade 1 bordering on grade 2 spondylolisthesis of LS on S1 which remains unchanged throughout the study; 2) surgical changes with pedicle screw placement from LS through S1; 3) stable scohotic curvature of the thoracolumbar spine. (Tr. 274).

In a record dated May 3, 2011, Dr. Fasano interpreted an MRI. (Tr. 271). Dr. Fasano's impressions were: 1) status post L5 laminectomy with spinal

stabilization hardware at the L5-S I level. There is a Grade 1 anterolisthesis of L5 on S1, without evidence of recurrent disc herniation or disc bulge at that level; 2) small central disc protrusion at L4-L5 with mild indentation on the ventral thecal sac; 3) otherwise unremarkable appearance of the lumbar spine. (Tr. 272).

### 8. Psychological Consultative Examination: David Smock, Ph.D.

On August 19, 2011, Plaintiff presented for a psychological consultative examination with Dr. Smock. (Tr. 283-85). Plaintiff reported that she drove herself to the evaluation and lived with her 11-year-old son and 2-year-old daughter. (Tr. 283). Dr. Smock observed that "there was a clear emphasis in her voice on the things that distressed her," at one point Plaintiff "broke into tears, clearly overwhelmed by the emotions regarding what she was talking about," and "there was a clear neediness about her throughout the presentation." (Tr. 283). Plaintiff reported that she last worked in 2008 as a housekeeper in a hotel and was fired after she wrecked her husband's truck and was unable to get to work. (Tr. 284). Prior to that, she was able to do the task as assigned and got along adequately with others. (Tr. 284). She reported that she has worked as a nursing assistant between the years 1998 and 2004, and there were times that she took time off to be with her children. (Tr. 284). Plaintiff reported that she was able to do jobs as assigned, and for the most part, got along well with others. (Tr. 284). She

reported that in her jobs she would stay to herself because of the anxiety and that helped her to get along adequately with people. (Tr. 284).

Plaintiff reported that she began experiencing mental health symptoms when she was five years of age when her father died. (Tr. 284). Plaintiff reported that she did not get into regular treatment until 2008, in which she was hospitalized three times, once in February at Geisinger Medical Center for a week, once at the Meadows in March for a few weeks, and in June she an involuntary hospitalization at the Meadows. (Tr. 284). Plaintiff reported being in treatment from the time of the hospitalizations in 2008 until about six months prior to the consultative evaluation. (Tr. 284).

Plaintiff reported having trouble recalling all of her current medications. (Tr. 284). Plaintiff said that she takes her medications as prescribed and they help her somewhat. (Tr. 284). Plaintiff reported that her only medical problem was hypothyroidism. (Tr. 284). Plaintiff reported that she drank alcohol socially, but not in excess and that she had a history of drinking on a daily basis and to excess but no longer consumes to the same degree as in the past. (Tr. 284-85).

Dr. Smocked observed that Plaintiff's affect was somewhat labile and mood was "low." (Tr. 285). Plaintiff reported periods of depression where she cries, loses interest in everyday activities, loses motivation to act, and isolates herself from others. (Tr. 285). Plaintiff reported that she wished that she was dead and often

experienced suicidal thoughts with an impulse to act on them. (Tr. 285). Plaintiff stated that when it gets that bad, she writes as a way of coping and then the suicidal thoughts would pass. (Tr. 285). Plaintiff reported experiencing suicidal thoughts daily and has considered readmitting herself into a hospital. (Tr. 285). Plaintiff also daily experiences anxiety, where she shakes, sweats, feels chest pain, feel shortness of breath and an increased heart rate. (Tr. 285). Plaintiff denied any problems of anger. Plaintiff reports infrequent bouts of high energy levels. (Tr. 285).

Plaintiff reported episodes of anxiety, suicidal thoughts, and vague auditory/visual hallucinations. (Tr. 285). Dr. Smock observed her to have appropriate dress and grooming, good eye contact, no pressured speech, and clear and coherent thought processes. (Tr. 285). Dr. Smock opined that Plaintiff's reality testing was distorted; her attention and concentration showed some impairment, and her recent and remote memory were only mildly impacted by her ability to pay attention. (Tr. 285). Dr. Smock observed that Plaintiff was able to say the letters of the alphabet fairly quickly, smoothly and accurately. (Tr. 285).

Dr. Smock observed that Plaintiff was able to correctly make simple calculations, although she needed one of the questions repeated. (Tr. 285-86). Plaintiff was able to count backwards from 30 by 3s correctly, recalled four of four objects immediately after they were said to her and all four of them 5 minutes later.

(Tr. 286). She recalled five digits forward, but only three of five in reverse. (Tr. 286). Dr. Smock noted that it was "noteworthy she was able to recall more than five digits forward and more than three digits in reverse, but would get them out of sequence, a function of inattention." (Tr. 286).

Dr. Smock opined that Plaintiff's insight into her illness and need for treatment was quite limited as she was aware of some of the symptoms, but has "very little in the way of coping strategies at this point." (Tr. 286). Dr. Smock opined that:

> [Plaintiff] would have some difficulty sustaining attention to work, and for this reason, would have some difficulty following and understanding directions. She would have difficulty dealing with the stress of a workplace. Her affect is labile and only marginally under control. She would have difficulty maintaining a regular schedule. She would have some difficulty making appropriate decisions except in a very simple environment. She could do simple tasks independently, but would have trouble with complex tasks. She would have some difficulty with learning new tasks. She would have some difficulty relating effectively to peers, supervisors and customers. It is felt that she could manage her own funds.

(Tr. 286). Dr. Smock assessed Plaintiff with bipolar disorder and generalized anxiety disorder and recommended that she restart mental health treatment. (Tr. 286). Dr. Smock stated that Plaintiff's prognosis was guarded given that she had a "history of struggling now for several years, with three hospitalizations early in that sequence" and "[s]he actually has had emotional problems much much longer." (Tr. 286-87). Dr. Smock added that Plaintiff clearly gets overwhelmed

by her affect and has minimal strategies for coping at this point and "[a]s a result, her ability to cope with her world is quite limited." (Tr. 287).

Along with this examination, Dr. Smock completed a questionnaire indicating that Plaintiff had slight restrictions understanding, remembering, and carrying out short, simple instructions; moderate limitations understanding, remembering, and carrying out detailed instructions; and marked difficulty interacting appropriately with the public, supervision, and co-workers and responding appropriately to work pressures in a work setting. (Tr. 279).

### 9. Agency Opinion: Anne C. Zaydon. M.D.

On July 15, 2011, Dr. Zaydon filled a questionnaire indicating that Plaintiff did not have any limitations in understanding and memory and had limitations in ability to sustain concentration and persistence. (Tr. 62). Dr. Zaydon opined that Plaintiff did not have any significant limitations in ability to: 1) carry out very short and simple instructions; 2) sustain an ordinary routine without special supervision; 3) work in coordination with or in proximity to others without being distracted by them; 4) ask simple questions or request assistance; 5) maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; 6) be aware of normal hazards and take appropriate precautions; 7) travel in unfamiliar places or use public transportation; and, 7) set realistic go al s or make plans independently of others. (Tr. 63-64).

Dr. Zaydon opined that Plaintiff had moderate limitations in her ability to: 1) carry out detailed instructions; 2) make simple work-related decisions; 3) The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; 4) inter act appropriately with the general public; 5) accept instructions and respond appropriately to criticism from supervisors; 6) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and, 7) respond appropriately to changes in the work setting. (Tr. 63-64).

Dr. Zaydon opined that Plaintiff had marked limitations in the ability to: 1) maintain attention and concentration for extended periods; 2) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. (Tr. 63). In support of her opinion, Dr. Zaydon elaborated:

> [Plaintiff's] ability to understand and remember complex or detailed instructions is limited, however, he/she would be expected to understand and remember simple, one and two-step instructions. The claimant is able to carry out very short and simple instructions. [Plaintiff] is capable of asking simple questions and accepting instruction. The claimant is able to maintain socially appropriate behavior and can perform the personal care functions needed to maintain an acceptable level of personal hygiene. The Claimant would be able to make simple decisions. Review of the medical evidence reveals that the claimant retains the abilities to manage the mental demands of many types of jobs not requiring complicated tasks.

Based on the evidence of record, the claimant's statements are found to be partially credible.

[Plaintiff] is able to meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from her impairment. [PLAINTIFF] IS CAPABLE OF SIMPLE, ROUTINE WORK.

(Tr. 64) (emphasis in original).

## 10. Clinton Medical Associates

In a treatment noted dated August 15, 2012, Plaintiff followed-up from an ER visit due to her panic disorder where she complained of shortness of breath, chest pain and tremors. (Tr. 338). It was noted that Plaintiff suffered from PTSD due to a rape and beating a year prior. (Tr. 338). She was prescribed medication to help with mood stabilization and recommended to contact psychiatrist regarding her depression and anxiety. (Tr. 338).

In a treatment note dated September 27, 2011, Plaintiff indicated that she felt like she was taking too many medications and wanted to decrease them. (Tr. 337). She reported that she was seeing a doctor at UCBH but that she "doesn't get along" with him and wants a new psychiatrist. (Tr. 337). Plaintiff reported still taking Paxil and other medications and that she had no suicidal ideation. (Tr. 337).

In a treatment note dated January 24, 2012, Plaintiff sought to follow-up from an ER visit on January 18, 2012, seeking treatment for a rape. (Tr. 334, 342). In a treatment note dated March 16, 2012, it was indicated that Plaintiff's mood

and affect were normal. (Tr. 333). In a treatment record dated June 8, 2012, it was indicated that Plaintiff's bipolar disorder was stable with psychiatric medication and that Plaintiff had not experienced any "highs and lows" or suicidal or homicidal ideation recently. (Tr. 313). Treatment notes indicated that on July 2, 2012, Plaintiff was a part of a motor vehicle accident where she rear-ended another car, her airbags did not deploy. (Tr. 311). Plaintiff reported pain down her neck and arms. (Tr. 311). On July 10, 2012, and July 16, 2012, Plaintiff complained of severe headache and neck pain with pain level at four on a scale where ten is the most severe. (Tr. 310).

### 11. Susquehanna Behavioral Health: Stephanie King, C.R.N.P

On October 17, 2011, Plaintiff reported experiencing a lot of trouble sleeping, and thought that she was on too many medications. (Tr. 387). She was a former patient of Dr. Roy at the Meadows. (Tr. 387). Plaintiff wanted to get her medications straightened out as she felt overmedicated. (Tr. 387). Plaintiff had stopped taking Chlorpromazine and cogentin due to side effects and sedation. (Tr. 387). Plaintiff reported current symptoms include difficulty falling and staying asleep, mood swings, depression and tearfulness, and anxiety and panic attacks. (Tr. 387). Plaintiff also reported some symptoms of PTSD including panic attacks, and flashbacks when she is around men. (Tr. 387). Plaintiff reported being raped

a year ago by two men and describes flashbacks and nightmares regarding the incident. (Tr. 387).

Plaintiff reported a history of cutting, suicidal ideation and attempts, and multiple inpatient hospitalizations. (Tr. 387). Current medications include Prazosin 1 mg daily for PTSD, Paxil 20 mg daily, Topamax 50 mg BID, Klonopin 1 mg daily PRN as needed for anxiety. (Tr. 387). Plaintiff was not taking chlorpromazine or cogentin as ordered. (Tr. 387).

Ms. King noted that Plaintiff came with her two-year-old who was "quite agitated and crying throughout the entire interview, making the interview difficult. It was difficult to obtain accurate history." (Tr. 387). Ms. King noted that the "[i]nterview was difficult to complete due to her 2 year old who was screaming and wanted to leave during entire interview. Patient was quite distracted by her child and as a result assessment was limited." (Tr. 391). Diagnoses included bipolar disorder, borderline personality disorder, depression, anxiety, and PTSD. (Tr. 387). Plaintiff's history of medications included: Effexor; Seroquel, which was too sedating; Geodon; Depakote; Lexapro; Zoloft; Wellbutrin; Risperdal; Abilify; Trazodone; Chlorpromazine; Cogentin; Topamax; Klonopin; and, Ativan. (Tr. 388). Ms. King opined that Plaintiff's ability to perform ADL's was fair. (Tr. 388). Upon examination, Ms. King observed that Plaintiff was able to hold a conversation, her concentration was poor, and was unable to complete serial 7's or

days of the week in reverse order. (Tr. 391). Plaintiff's remote memory was normal, she was able to recall past events, recent memory was normal, Plaintiff was able to recall events from last day, recent recall was poor, and Plaintiff was unable to recall three words immediately after two rehearsals, and then again five minutes later. (Tr. 391). Ms. King opined that Plaintiff's judgment was poor and she had a slight awareness of her illness. (Tr. 391).

On November 4, 2011, Plaintiff reported greatly improved sleep since starting the Trazodone. (Tr. 385). However, Plaintiff said that depression, anxiety, irritability, and anger persisted. (Tr. 385). Plaintiff reported that her mood had been very unstable and felt sedated with current medications. (Tr. 385). Ms. King observed that Plaintiff's gait was noticeably slow, speech was slow, and Plaintiff appeared to have difficulty focusing attention and thoughts. (Tr. 385). Plaintiff stated that she wished to discontinue several medications and try a combination that would better address anxiety and mood swings. (Tr. 385). Upon examination, Ms. King observed that Plaintiff was able to hold a conversation, her concentration was poor, and was unable to complete serial 7's and days of the week in reverse order. (Tr. 385). Plaintiff's remote memory was normal, she was able to recall past events, recent memory was normal, Plaintiff was able to recall events from last day, recent recall was poor, and Plaintiff was unable to recall three words immediately after two rehearsals, and then again five minutes later. (Tr. 385). Ms.

King opined that Plaintiff's judgment was poor and she had a slight awareness of her illness. (Tr. 385-86).

On November 17, 2011, Plaintiff reported greatly improved mood, energy level, and improved depression. (Tr. 383). According to Plaintiff, her depression was improving daily and she had been doing more with her daughter as a result. (Tr. 383). She was sleeping through the night and felt more able to cope with life. (Tr. 383). Plaintiff reported that tremors stopped after she stopped taking the Topamax and sedation is improved. (Tr. 383). Plaintiff stated that her mind was clearer with less sedation and improved clarity and concentration. (Tr. 383). Examination findings were substantially verbatim to those made at the June 2012 visit with an added summary of the current subjective report of symptoms from the visit. (Tr. 383-84).

On December 16, 2011, Plaintiff reported worsened depression, decreased energy, increased anxiety, and insomnia since stopping the Cymbalta. (Tr. 381). Plaintiff explained that her insurance would not cover Cymbalta. (Tr. 381). Plaintiff reported experiencing poor sleep, racing thoughts, and nightmares. (Tr. 381). Examination findings were substantially verbatim to those made at the June 2012 visit with an added summary of the current subjective report of symptoms from the visit. (Tr. 381-82).

In a treatment record dated January 6, 2012, Plaintiff reported slight improvement in depression and felt like she wanted to do more with herself and had improved energy. (Tr. 379). She reported that the racing thoughts were slightly improved, acknowledge that she drank too much alcohol the prior week and that possibly affected her mood and caused some depression. (Tr. 379). Plaintiff stated that she would like to remain on current medication. (Tr. 379). Examination findings were substantially verbatim to those made at the June 2012 visit with an added summary of the current subjective report of symptoms from the visit. (Tr. 379-80).

In a treatment record dated January 25, 2012, Plaintiff reported worsening anxiety after being raped the previous week, was very tearful and depressed. (Tr. 377). Plaintiff reported her children witnessed the event and they were also struggling and receiving therapy at school. (Tr. 377). Plaintiff reported getting counseling at the women's shelter. (Tr. 377). Plaintiff reported her sleep had worsened and she felt overwhelmed and depressed. (Tr. 377). Examination findings were substantially verbatim to those made at the June 2012 visit with an added summary of the current subjective report of symptoms from the visit. (Tr. 377-78).

In a treatment record dated February 13, 2012, Plaintiff reported slightly improved anxiety since the last visit noting that the last two weeks had been

difficult due to situational stressors involving the legal issues surrounding her rape. (Tr. 375). Plaintiff reported that she has been able to do everything she needed to do, and felt that her depression was manageable. (Tr. 375). Plaintiff denied experiencing any panic attacks, reported that the current medications were helpful for most of her symptoms, although her insomnia has worsened. (Tr. 375). Examination findings were substantially verbatim to those made at the June 2012 visit with an added summary of the current subjective report of symptoms from the visit. (Tr. 375-76).

In a treatment record dated March 5, 2012, Plaintiff reported continued anxiety and that she did not like the sedating side-effect of Remeron. (Tr. 373). Plaintiff reported continued stress which included having to go to court the next day regarding rape charges she filed against her child's father. (Tr. 373). Plaintiff reported that she started therapy with Keystone Counseling and that it was going well. (Tr. 373). Plaintiff reported that her sleep and mood have been "ok" and her current medications were working well. (Tr. 373). Examination findings were substantially verbatim to those made at the June 2012 visit with an added summary of the current subjective report of symptoms from the visit. (Tr. 373-74).

In a treatment record dated March 20, 2012, Plaintiff reported improved anxiety but worsening depression and mood. (Tr. 371). Plaintiff reported experiencing significant stress due to long court case and feeling impatient,

irritable and snappy. (Tr. 371). Plaintiff reported much less patience, feeling depressed and overwhelmed. (Tr. 371). Plaintiff reported that she was only allowed six prescriptions monthly from "MA" and was already on six and Ms. King discussed antidepressants that were on the $4.00 formulary. Ms. King noted that she would start Plaintiff on a trial of Prozac since other antidepressants like Lexapro and Paxil had not worked in the past. (Tr. 371). Examination findings were substantially verbatim to those made at the June 2012 visit with an added summary of the current subjective report of symptoms from the visit. (Tr. 371-72).

In a treatment record dated April 10, 2012, Plaintiff reported improvement of anxiety and depression since starting Fluoxetinc and that irritability and anger had also decreased. (Tr. 369). Plaintiff stated that she would like to continue current medications and feeling stable. (Tr. 369). Examination findings were substantially verbatim to those made at the June 2012 visit with an added summary of the current subjective report of symptoms from the visit. (Tr. 369).

In a treatment record dated May 10, 2012, Plaintiff reported stable symptoms, felt that the medication was helping, and denied any depression. (Tr. 367). Plaintiff reported that her anxiety improved and had not needed the Vistaril. (Tr. 367). Plaintiff reported continued situational stressors with her daughter's father but was pleased that even with a significant stressor she did not engage in self-injurious behavior. (Tr. 367). Examination findings were substantially

verbatim to those made at the June 2012 visit with an added summary of the current subjective report of symptoms from the visit. (Tr. 367-78).

In a treatment record dated June 7, 2012, Plaintiff reported some increase in anxiety and that her daughter's father has his arraignment for her alleged rape next month. (Tr. 365). Plaintiff reported that the father has been trying to see her daughter and this was causing increased stress. (Tr. 365). Plaintiff was very fearful of their court date and has been experiencing poor sleep and an increase in tearfulness, but without any cutting or suicidal ideation. (Tr. 365). Ms. King adjusted Plaintiff's medications. (Tr. 365). Upon examination, Ms. King generally noted normal findings with exception that Plaintiff's affect was "anxious, stable, and concordant" and mood was anxious. (Tr. 365). Ms. King observed that Plaintiff was able to hold a conversation, her concentration was good, and was able to complete serial 7's and days of the week in reverse order. (Tr. 365). Plaintiff's remote memory was normal, she was able to recall past events, recent memory was normal, Plaintiff was able to recall events from last day, recent recall was good, and Plaintiff was able to recall three words immediately after two rehearsals, and then again five minutes later. (Tr. 365-66). Ms. King opined that Plaintiff's judgment was poor and she had a slight awareness of her illness. (Tr. 366).

In a treatment record dated July 5, 2012, Plaintiff reported continued anxiety and depression. (Tr. 363). Ms. King observed that Plaintiff was wearing a neck

brace because "she was hit by a hit and run driver and suffered whiplash." (Tr. 363). Plaintiff reported "experiencing anxiety about driving and having people pull out in front of her again" and had not been able to drive due to flashbacks and panic attacks regarding the accident. (Tr. 363). Plaintiff stated that the rape trial was extended now to the same date that her mother passed away. (Tr. 363). Ms. King noted that Plaintiff had been experiencing significant financial issues and the combined stressors left her depressed and anxious with poor motivation. Plaintiff reported taking Trazodone, sleeping well and that Valium helped with the anxiety. (Tr. 363). Plaintiff reported that her mood was unstable with an increase in irritability. (Tr. 363). Examination findings were substantially verbatim to those made at the June 2012 visit with an added summary of the current subjective report of symptoms from the visit. (Tr. 263-64).

### III.   Legal Standards and Review of ALJ Decision

To receive disability or supplemental security benefits, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 42 U.S.C. § 1382c(a)(3)(A). A claimant for disability benefits must show that he or she has a physical or mental impairment of such a severity that:

> [H]e is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step evaluation process to determine if a person is eligible for disability benefits. 20 C.F.R. § 404.1520; *accord Plummer*, 186 F.3d at 428. If the Commissioner finds that a Plaintiff is disabled or not disabled at any point in the sequence, review does not proceed. 20 C.F.R. § 404.1520(a)(4). The Commissioner must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and, (5) whether the claimant's impairment prevents the claimant from doing any other work. 20 C.F.R. §§ 404.1520, 416.920. Before moving on to step four in this process, the ALJ must also determine Plaintiff's residual functional capacity ("RFC"). 20 C.F.R. §§ 404.1520(e), 416.920(e).

The disability determination involves shifting burdens of proof. The claimant bears the burden of proof at steps one through four. *See Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). If the claimant satisfies this burden,

then the Commissioner must show at step five that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. *Id.* The ultimate burden of proving disability within the meaning of the Act lies with the plaintiff. *See* 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(a).

When reviewing the Commissioner's decision denying a claim for disability benefits, the Court must uphold the findings of the Commissioner so long as those findings are supported by substantial evidence. *See Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988); *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir. 2008). Substantial evidence is a deferential standard of review. *See Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). Substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 564 (1988) (quoting *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence requires only 'more than a mere scintilla' of evidence, *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999) (quoting *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995)), and may be less than a preponderance. *Jones*, 364 F.3d at 503. If a reasonable mind might accept the relevant evidence as adequate to support a conclusion reached by the Commissioner, then the Commissioner's determination is supported by substantial

evidence. *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999); *Johnson*, 529 F.3d at 200.

## A. Plaintiff's Credibility

Where a medically determinable physical or mental impairment that could reasonably be expected to produce the individual's pain or other symptoms, however, the severity of which is not substantiated by objective medical evidence, the ALJ must make a credibility finding on the claimant's subjective statements. SSR 96-7p. The credibility finding must be based on a consideration of the entire case record. SSR 96-7p. In determining a claimant's credibility regarding the severity of symptoms, the ALJ must consider the following factors in totality: 1) the extent of daily activities; 2) the location, duration, frequency, and intensity of pain or other symptoms; 3) precipitating and aggravating factors; 4) the type, dosage, effectiveness, and side effects of any medication; 5) treatment other than medication for the symptoms; 6) measures used to relieve pain or other symptoms; and, 7) other factors concerning functional limitations and restrictions due to pain or other symptoms. SSR 96-7p; 20 C.F.R. §§ 404.1529, 416.929; *accord Canales v. Barnhart*, 308 F. Supp. 2d 523, 527 (E.D. Pa. 2004).

Evidence can be used to discount credibility if such evidence demonstrates a true contradiction or inconsistency. *See e.g. Horodenski v. Comm'r of Soc. Sec.*, 215 F. App'x 183, 188 (3d Cir. 2007) (finding significant a plaintiff's testimony

about her daily activities was internally inconsistent, thus supporting the ALJ's determination of according her testimony little weight); *Smith v. Astrue*, 359 F. App'x 313, 317 (3d Cir. 2009) (claimant's testimony that she was essentially bedridden contradicted by evidence that she had been primary caretaker for small child for two years); *Gleason v. Colvin*, No. 3:14-CV-00021-GBC, 2015 WL 4232569, at *13 (M.D. Pa. July 13, 2015); *see also Orn v. Astrue*, 495 F.3d 625, 636 (stating that inconsistencies in testimony or between testimony and other evidence is proper reason to discredit a social security plaintiff); *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008) (ALJ erred in disregarding uncontradicted evidence that a plaintiff's thirteen-year-old son took responsibility for many of plaintiff's activities of daily living); *Hernandez v. Astrue*, No. CV 09-1626 SS, 2010 WL 1710350, at *4 (C.D. Cal. Apr. 26, 2010).

Activities of daily living can generally only support an adverse credibility finding if (1) the activities of daily living indicate that "a claimant is able to spend a substantial part of his day engaged in pursuits involving the performance of physical functions that are transferable to a work setting" or (2) the activities of daily living contradict other allegations by the claimant, rendering them internally inconsistent. *Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007); *accord Gonzales v. Colvin*, No. 3:13-CV-02620, at ECF No. 26 (M.D.Pa. Feb. 17, 2015) (Adopting recommendation ECF No. 24). This is because a finding of non-disability requires

that a claimant be able to "do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." *Titles II & Xvi: Assessing Residual Functional Capacity in Initial Claims*, SSR 96-8P (S.S.A. July 2, 1996).

The Third Circuit has repeatedly reaffirmed that activities of daily living which do not indicate transferable job skills for a regular and continuing basis cannot be used as substantive evidence of non-disability. *Smith v. Califano*, 637 F.2d 968, 971-72 (3d Cir. 1981) ("Disability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity….It is well established that sporadic or transitory activity does not disprove disability"); *Kangas v. Bowen*, 823 F.2d 775, 778 (3d Cir. 1987); *Fargnoli v. Massanari*, 247 F.3d 34, 44 (3d Cir. 2001) ("Fargnoli's trip to Europe in 1988 cannot be the basis for a finding that he is capable of doing a light exertional job because sporadic and transitory activities cannot be used to show an ability to engage in substantial gainful activity.") (internal citations omitted). "Generally, we do not consider activities like taking care of yourself, household tasks, hobbies, therapy, school attendance, club activities, or social programs to be substantial gainful activity." 20 C.F.R. § 404.1572.

///

## 1.  Caring for One's Children

The ALJ erred in the negative inference drawn from the fact that Plaintiff had custody of her three children ages eleven, six, and five.  In the August 29, 2012, opinion the ALJ found:

> [Plaintiff's] allegations are just not fully credible. She has custody of her three children. In a function report completed by the claimant in October 2010, she noted that she was still able to get her children on and off the bus, thus having some routine during the day.

(Tr. 18).  The ALJ also stated that the "examinations do not support physical or mental disability. Her activities of daily living consist of taking care of her young kids."  (Tr. 20).

The ability to care for children, alone, does not inherently indicate that a claimant possesses the ability to perform on a regular and continuing basis in a work-setting.  First, the skills of caring for a child in one's own home differ from the stress of a work-setting.  *See Gonzales v. Colvin*, No. 3:13-CV-02620, at ECF No. 26 (M.D.Pa. Feb. 17, 2015); *Harsh v. Colvin*, No. 3:13-CV-42 GLS, 2014 WL 4199234, at *4 (N.D.N.Y. Aug. 22, 2014) ("[T]he ALJ placed undue emphasis on [the plaintiff's] ability to perform a 'wide range of daily activities,' including doing some cooking, cleaning, laundry, and shopping, sitting on her porch, reading, and caring for her kids. Under the circumstances and given the medical opinions of record, it was error for the ALJ to infer an ability to handle the stress demands of

competitive, remunerative employment on a sustained basis from the ability to perform very basic activities of daily living."); *Draper v. Barnhart*, 425 F.3d 1127, 1131 (8th Cir. 2005) ("[T]he test is whether the claimant has 'the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.' In other words, evidence of performing general housework does not preclude a finding of disability.") (internal quotations omitted).

Second, caring for children allows for flexibility and rest breaks. *See Gonzales v. Colvin*, No. 3:13-CV-02620, at ECF No. 26 (M.D.Pa. Feb. 17, 2015); *Gentle v. Barnhart*, 430 F.3d 865, 867-68 (7th Cir. 2005) (caring for a child "has a degree of flexibility that work in the workplace does not"); *Piatt v. Barnhart*, 225 F. Supp. 2d 1278, 1291 (D. Kan. 2002) (remanding in part because "[a]lthough Plaintiff cares for three children between the ages of 7 and 13, and cooks and performs some household tasks, she is limited by her inability to stoop or reach down; by back, leg and arm pain after a period of activity; and by her need to take 10 to 15 minute breaks while cooking and doing household tasks."); *Pen v. Astrue*, No. 12-CV-01041 NC, 2013 WL 3990913, at *10 (N.D. Cal. Aug. 2, 2013) (Remanding where "the ALJ determined from [a plaintiff's] statements that she is able to care for her children, drive, and shop, that she is, therefore, more active than she claims" but "the ALJ was incorrect in concluding that this is evidence of

her ability to work outside of the home when the demands of a workplace environment do not afford the same opportunities for breaks, rest, or assistance"); *see generally Bjornson v. Astrue,* 671 F.3d 640, 647 (7th Cir. 2012) ("The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons . . . and is not held to a minimum standard of performance, as [one] would be by an employer. The failure to recognize these differences is a recurrent, and deplorable, feature of opinions by administrative law judges in social security disability cases."); *Moss v. Colvin*, No. 1:13-CV-731-GHW-MHD, 2014 WL 4631884, at *33 (S.D.N.Y. Sept. 16, 2014) ("There are critical differences between activities of daily living (which one can do at his own pace when he is able) and keeping a full time job"); *Cooke v. Colvin*, No. 4:13-CV-00018, 2014 WL 4567473, at *15 (W.D. Va. Sept. 12, 2014) ("[D]aily activities differ from the requirements of gainful employment in several important respects. A person has flexibility in scheduling his daily activities, can get help from other persons, and is not held to a minimum standard of performance; by contrast, an employer expects an employee to perform tasks proficiently, independently, and in a timely manner") (internal citations omitted).

Moreover, parents may go to great lengths to care for their children that would not be sustainable in the workplace, and should not be discouraged from

doing so. *See, e.g. Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998) ("[D]isability claimants should not be penalized for attempting to lead normal lives in the face of their limitations."); *Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005) (Claimant "*must* take care of her children, or else abandon them to foster care or perhaps her sister, and the choice may impel her to heroic efforts. A person can be totally disabled for purposes of entitlement to social security benefits even if, because of an indulgent employer or circumstances of desperation, he is in fact working.") (emphasis in the original) (internal citations omitted); *Vergara v. Astrue*, No. 1:10-CV-00341, 2011 WL 4452198, at *7 (N.D. Ind. Sept. 26, 2011) ("[D]ire circumstances can force an individual to perform work activities that he may not be able to otherwise sustain."); *McHenry v. Astrue*, No. CIV.A. 07-1360, 2008 WL 3068864, at *13 (W.D. Pa. Aug. 5, 2008) (Caring for elderly parents does not negate disability, as it may be the result of "heroic efforts"); *Moss v. Colvin*, No. 1:13-CV-731-GHW-MHD, 2014 WL 4631884, at *33 (S.D.N.Y. Sept. 16, 2014) ("[P]eople should not be penalized for enduring the pain of their disability in order to care for themselves.") (internal citations omitted).

Moreover, the ALJ overemphasized Plaintiff's testimony of taking her children to a bus stop while ignoring testimony of Plaintiff's dependence on her eldest child and her ex-husband to care for the household and the younger children. (Tr. 36-37, 39). Plaintiff testified that her eldest does "mostly all of the cooking,"

bathes and feeds the youngest child, does the laundry, and cleans the house. (Tr. 37, 39). Plaintiff testified that she will make ramen noodles or pizza while her eldest child "does a lot more, like hamburgers or she bakes, she cooks." (Tr. 39). Plaintiff testified that her ex-husband takes her eldest child to the Laundromat her eldest child washes the clothes, brings them and hangs them up. (Tr. 39). When questioned more about who does the cleaning in her house, Plaintiff testified that her eldest did a lot of the picking up and the dishes, and her middle child vacuumed. (Tr. 39).

An ALJ cannot rely only on the evidence that supports his or her conclusion, but also must explicitly weigh all relevant, probative, and available evidence; and provide some explanation for a rejection of probative evidence which would suggest a contrary disposition. *See Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994); *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981). Based on the foregoing, the Court find the ALJ erred and the case should be remanded.

## B. Weight to Medical Opinions

The ALJ found:

> Dr. Smock also opined that the claimant has marked limitations in her ability to interact appropriately with the public, supervisors, co-workers and respond to work pressures and changes in a usual and routine work setting. The undersigned Administrative Law Judge gives limited weight to Dr. Smock's findings in his mental status examination and his opinions on the 'Medical Source Statement' since they are not supported by the other evidence in the record. For

instance, the claimant has an 11 year old and a 2 year old whom she admits that she cares for both adequately.

(Tr. 20) (internal citation omitted).  As discussed above, the ALJ's adverse inferences from Plaintiff's custody of her children in this instance amounted to error.  As such, it was error for the ALJ to give limited weight to Dr. Smock's findings of marked limitations based on Plaintiff's custody of her children.

### C. Episodes of decompensation

In the August 2012 decision, the ALJ stated that Plaintiff "has experienced no episodes of decompensation, which have been of extended duration."  (Tr. 17). The ALJ further found that:

[Plaintiff] has a problem with alcohol abuse. She was an inpatient at The Meadows Psychiatric Center from March 28, 2008 to April 10, 2008. Upon discharge her diagnoses were major depression, recurrent, post-traumatic stress disorder and alcohol abuse with a current GAF of 50 and the highest GAF in the past year at 55.

(Tr. 19) (internal citation omitted).

It was error for the ALJ disregard Plaintiff's three lengthy psychiatric hospitalizations and to mischaracterize Plaintiff's predominantly psychiatric hospitalization as solely due to alcohol treatment.  As the Seventh Circuit has observed, "bipolar disorder can precipitate substance abuse, for example as a means by which the sufferer tries to alleviate her symptoms. . . . the fact that substance abuse aggravate[s] [one's] mental illness does not prove that the mental

illness itself is not disabling." *Kangail v. Barnhart*, 454 F.3d 627, 629 (7th Cir. 2006).

Moreover, given that the ALJ erred in her allocation of weight to Dr. Smock, it was also error not to credit Dr. Smock's assessment of the significance of Plaintiff's lengthy prior psychiatric hospitalizations. Based on the foregoing, the ALJ erred in failing to acknowledge Plaintiff's three psychiatric hospitalizations.

### D. Step Five Burden

The Commissioner must show at step five that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. *See Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). In this instance, the ALJ erred in failing to address and develop evidence that regarding Plaintiff's limitations in regular attendance and ability to work with men. Dr. Zaydon opined that Plaintiff had marked limitations in the ability to "perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances." (Tr. 63). Dr. Smock opined that Plaintiff "would have difficulty maintaining a regular schedule." (Tr. 268). In a treatment record dated October 17, 2011, Plaintiff reported panic attacks and flashbacks when she was around men. (Tr. 387).

During the hearing the ALJ asked the Vocational Expert ("VE") if a person took an extra work break of forty-five minutes to an hour per day or was off task

twenty percent of the work day, would there be any jobs available. (Tr. 49). The VE responded, "No." (Tr. 49). Plaintiff's attorney asked for the VE to review the marked limitations opined by Dr. Smock, in particular, the marked limitations of Plaintiff to interact with the public, coworkers or supervisors, and marked limitation in ability to deal with work stresses. (Tr. 49-50). Plaintiff's attorney asked if someone with those marked limitations could do any of the jobs previously identified by the VE and the VE responded, "No." (Tr. 49-50). At no point was the VE asked regarding limitations identified by Drs. Zaydon and Smock regarding Plaintiff's ability to keep regular attendance for work, or any PTSD limitations she may have working with men.

The Court finds that evidence was not adequately developed or discussed with regard to these limitations and the Commissioner's burden was not met in establishing whether jobs existed in the national economy for Plaintiff in light of her limitations. Thus, remand is necessary for the ALJ to address in the first instance.

## E. Remaining issues

Because Plaintiff's case will be remanded for the ALJ's failure to further development and to consider and analyze all relevant medical evidence, it is unnecessary to examine Plaintiff's remaining claims. A remand may produce different results on these claims, making discussion of them moot. *See LaSalle v.*

*Comm'r of Soc. Sec.*, No. CIV.A. 10-1096, 2011 WL 1456166, at *7 (W.D. Pa. Apr. 14, 2011).

### IV.     Conclusion

Based on the foregoing, the Court finds that the ALJ's decision lacks substantial evidence.   Pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner is vacated, and this case is remanded for further proceedings.

An appropriate Order in accordance with this Memorandum will follow.

Dated: September 15, 2015

*s/Gerald B. Cohn*
GERALD B. COHN
UNITED STATES MAGISTRATE JUDGE
